No. 27,322.

OSCAR WILSON, *Appellee*, v. THE FOWLER PACKING COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

1. MASTER AND SERVANT — *Liability for Injury to Third Person—Shooting of Trespasser by Night Superintendent.* A packing plant is responsible for the acts of its night superintendent who is taking care of the property and who shoots a trespasser on the property upon receiving an unsatisfactory answer to a question concerning his presence there.

2. SAME—*Special Findings*—The findings of the jury are not so inconsistent but that they can be reconciled with the findings as a whole and with the general verdict.

3. DAMAGES—*Excessive Verdict.* This court cannot say that the verdict was excessive.

Appeal from Wyandotte district court, division No. 3; WILLIAM H. Mc-CAMISH, judge. Opinion filed May 7, 1927. Affirmed.

*E. S. McAnany, M. L. Alden, Thomas M. Van Cleave,* all of Kansas City, and *A. B. Reid,* of Chicago, Ill., for the appellant.

*E. E. Martin* and *H. E. Dean,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff recovered a judgment on the verdict of a jury for $5,750 damage caused by being shot by J. E. Boone, an employee of the defendant. The defendant appeals.

Special questions were answered by the jury as follows:

"1. Did J. E. Boone shoot the plaintiff: (*a*) While ejecting or attempting to eject plaintiff, or ordering him off of the premises claimed by the Fowler Packing Company? (*b*) In preventing or attempting to prevent him from committing any injury to the property of the defendant, Fowler Packing Company, or (*c*) From transgressing any rule or regulation of the Fowler Packing Company? Answer: (*a*) Yes. (*b*) Yes. (*c*) Yes.

"2. Did the said J. E. Boone shoot the plaintiff because he believed himself in danger at the time of being shot or injured by said Wilson? A. No.

"3. If you answer the foregoing question 'No,' state why the said J. E. Boone shot said Wilson? A. To show his authority.

"4. Did J. E. Boone, in his capacity as night superintendent and head watchman, attempt to exercise supervision and control of the Kaw river dyke, upon which Fowler's tracks were laid, and along which Wilson was walking at the time he was shot? A. Yes.

Appeal and Error, 4 C. J. pp. 872 n. 19, 873 n. 23. Damages, L. R. A. 1915F, 30; 8 R. C. L. 674. Master and Servant, 39 C. J. p. 1308 n. 17; 10 A. L. R. 1090; 18 R. C. L. 811. Trial, 38 Cyc. pp. 1926 n. 77, 1927 n. 82.

Wilson v. Fowler Packing Co.

"5. If you answer the above question in the affirmative, then state whether Boone was authorized by the officials of the Fowler Packing Company to exercise control and supervision over said dyke? A. Yes.

"6. Did Boone shoot Wilson while in the exercise of his duties as head watchman? A. Yes.

"7. At the time Boone fired the shot which struck Wilson, was Boone, as head watchman and in the discharge of his duty to his principal, attempting to detain Wilson, and question him and then eject him from the premises over which Boone was exercising control for the Fowler Packing Company? A. No.

"8. Did J. E. Boone shoot the plaintiff because said Wilson had answered his inquiry in substance, 'What the hell business is that of yours'? A. Yes."

1. The defendant contends that "as a matter of law the Fowler Packing Company was not liable because Boone's action was not within the scope of his employment." The following facts were established by the evidence. The defendant operated a packing plant in Kansas City, Kan. J. E. Boone was employed by the defendant as night superintendent and was in charge of the plant each day from about 5:30 o'clock in the evening until about 5 o'clock in the morning. On the day of the shooting, after Boone went on duty, the plaintiff was walking on property controlled by the defendant along the side of its buildings. Boone saw the plaintiff, accosted him, and questioned him concerning what he was doing there. The plaintiff replied in a somewhat insulting manner. Boone then shot him.

One of the night watchmen, employed at the plant, testified as follows:

"On September 1, 1924, was working for Fowler Packing Company as night watchman. Mr. Boone was my superior . . . I worked under Mr. Boone. At all the times mentioned, Mr. Boone occupied the same position. Got my instruction from Mr. Boone. Mr. Boone was the general officer of the whole plant and all the men working down there patrolling the plant got orders whatever he wanted done. . . . He had a discussion with Boone about trespassers up and down the dock that evening. I made report of seeing some men crawling around some empty cars on the track, and Boone, when I made the report, went down to the serum plant with me.

"Q. Now with reference to the watchmen going armed or carrying revolvers, I will ask you if you know whether or not the company furnished revolvers to the watchmen? A. I think each man furnished their own guns.

"If someone was seen upon the dock it was my duty as a watchman to find out what their business was. It was our duty to watch trespassers around the plant; we had instructions not to allow anyone on the company property except those who had business there."

Boone testified as follows:

"Am employed by the Fowler Packing Company, in charge of their plant at night; been there something near three years; am called night superin-

tendent; go on duty between 5:30 and 6 o'clock in the afternoon, and remain on duty until 5 or a little after 5 in the morning. Was there Labor Day, 1924. Went to the plant in the neighborhood of 5:30; checked in at 5:30, as near as I can remember. Had a gun that day.

"Q. What was your purpose in carrying a gun? A. For my own protection. At all times of the night, have occasion to go about in the yards there."

We quote from the brief of the defendant as follows:

"If the shooting had occurred when Boone was ejecting or attempting to eject plaintiff, then it might be argued that he was acting within the scope of his authority if he used more force than was necessary. There is no proof that Boone was authorized by his employer to commit an assault upon the plaintiff."

The evidence herein summarized refutes the contention of the defendant. J. E. Boone was employed by the defendant to guard its property at night. He was in the performance of that duty when he shot the plaintiff. Presumably the defendant did not employ Boone for the purpose of shooting any person who might be trespassing on its property, but it did employ him for the purpose of protecting that property from trespassers. There was evidence to show that property had been stolen from the plant of the defendant; that a report of that fact had just been made by one of the guards to Boone; that persons other than employees were then on the premises; and that Boone, when he shot the plaintiff, was looking for those persons. Concede that Boone was not employed by the defendant to harm trespassers; yet, the plaintiff was shot by Boone while he was performing his duty as superintendent of the plant endeavoring to protect the property of the defendant from any persons who might be trespassing thereon. That brings this case within the rule of *Mansfield v. Detective Agency,* 102 Kan. 687, 171 Pac. 625, where the court said:

"A master or principal is responsible for the tortious acts of his servant or agent where such acts are incidental to and done in furtherance of the business of the master or principal, even if such acts are done willfully or in excess of the authority conferred."

The principle involved was discussed in *Hudson v. M. K. & T. Rly. Co.,* 16 Kan. 470, 473, where the court used the following language:

"Was Trotter acting in the course of his employment in making the assault? For it does not appear that it was a part of his employment, that is, that he was employed directly to make the assault. Was it in the line of his duty, and growing out of the services he was employed to perform? He was as it appears in charge of the company's depot. As such it was his duty to remove

therefrom all persons improperly there, or improperly conducting themselves, though otherwise lawfully there. If in the supposed performance of this duty, and in ejecting plaintiff from the depot he had improperly ejected him, or had used unnecessary force in ejecting him, the company would have been liable, because he was doing that which the company had employed him to do, acting in the very line and course of his employment, and any mistake or violence on his part was the mistake or violence of his principal, the company."

Further discussion of this subject will be found in *Whitman v. Railway Co.*, 85 Kan. 150, 116 Pac. 234; *Lehnen v. Hines & Co.*, 88 Kan. 58, 127 Pac. 612; *Roberts v. Kinley*, 89 Kan. 885, 132 Pac. 1180; *Sipult v. Land & Grain Co.*, 94 Kan. 224, 146 Pac. 329; *De Leon v. Railway Co.*, 103 Kan. 780, 176 Pac. 636; and *Bjorkman v. Railway Co.*, 117 Kan. 420, 231 Pac. 1029.

2. The defendant contends that "the findings are not based on any consistent theory that can be reconciled with the findings as a whole or with the general verdict." We quote from the brief of the defendant as follows:

"The second, third, seventh and eighth findings negative the idea that Boone was attempting to eject or remove Wilson from the premises, or was acting within the scope of his employment . . . The first, fourth, fifth and sixth findings are substantially that Boone shot plaintiff while ejecting or attempting to eject him, to prevent him from injuring the property . . . that the act was done in his capacity as watchman. . . . The seventh finding flatly negatives the idea presented in the first, fourth, fifth and sixth findings."

We cannot agree with the defendant in its construction of the answers of the jury to the special questions submitted. Those answers are consistent with the fact that at the time the shooting was done Boone was in the performance of his duty as night superintendent of the plant and that in the performance of that duty he questioned the plaintiff. The answers of the jury show that Boone was angered at the plaintiff by his reply and immediately shot him.

3. The last matter presented by the defendant is that "in any event the verdict was grossly excessive, and shows prejudice and passion of the jury, and is not sustained by the evidence." This necessitates a description of the wound received by the plaintiff and the consequences of that wound. He was shot in the hip, the bullet struck the top part of the femur, glanced along the side of it and broke in two pieces which remain imbedded and encysted in the flesh. The head of the femur was injured permanently. The wound was painful, the pain continues and will continue in the future. The

plaintiff was a laboring man and is largely incapacitated from performing labor. Under these circumstances, this court cannot say that the verdict was excessive.

The judgment is affirmed.