2005 OK 36

**Lowell and Stella BAKER, as Parents and next friends of Summer Baker, a minor, Plaintiffs/Appellants,**

v.

**SAINT FRANCIS HOSPITAL, an Oklahoma corporation d/b/a Ave Maria Child Care, Defendant/Appellee.**

No. 100,713.

Supreme Court of Oklahoma.

Dec. 20, 2005.

John F. McCormick, Jr., John L. Randolph, Jr., Harry A. Parrish, Pray, Walker, Jackman, Williamson & Marlar, Tulsa, OK, for appellants.

Timothy G. Best, Sean H. McKee, Matthew B. Free, Best & Sharp, Tulsa, OK, for appellee.

PER CURIAM:

¶ 1 The question before this Court is whether the trial court erred in granting summary judgment to the appellee, Saint Francis Hospital, d/b/a Ave Maria Child Care. We conclude the trial court erred and reverse and remand for a hearing on the merits.

## I.  FACTS AND PROCEDURE

¶ 2 The parties have agreed on the following facts.  Ave Maria Child Care is a daycare facility that cares for children of employees of Saint Francis Hospital and its affiliates. The appellant, Stella Baker, was an employee of Laureate Psychiatric Clinic and Hospital, an affiliate of Saint Francis Hospital.  On September 6, 1998, Amy Davis was employed at the daycare facility as a caregiver when Stella Baker left her two-month-old daughter, Summer, there.  About 3:30 p.m., when Mrs. Baker arrived to pick up Summer, she heard her crying and noticed two small red marks on her right temple.  Davis was Summer's regular caregiver at Ave Maria, and when Mrs. Baker inquired about the marks, Davis denied knowing how Summer received them.

¶ 3 A few hours later, when bathing Summer at home, Mrs. Baker noticed the right side of Summer's head was swelling.  She called her pediatrician's office and was told to take her to the emergency room at Saint Francis Hospital.  The physicians there determined that Summer had two bilateral depressed skull fractures and suffered traumatic brain injury.

¶ 4 The appellants allege that Davis allowed Summer to fall from her crib while changing a diaper.  The parties agree that

Davis intentionally struck Summer's head two times against the corner of a shelf at the daycare facility. The record includes a copy of the Findings of Fact and Acceptance of Plea dated and file-stamped September 14, 1999, showing that Davis pled guilty to injury to a minor child. She received a sentence according to a plea agreement of ten years, seven in custody and the remaining three out of custody. On that document Davis claims to have hit Summer's head against the shelf because Summer would not stop crying. The pertinent language from Davis contained in the Findings of Fact and Acceptance of Plea document is as follows: "I hit Summers (sic) head against the cubby; she was crying she wouldn't stop crying." [1]

¶5 The Bakers sued Saint Francis Hospital alleging it was liable under the theory of *respondeat superior* for Davis's negligent and intentional acts. Both parties filed motions for summary judgment. The trial court denied the Bakers' motion and granted the hospital's. On appeal, the Court of Civil Appeals affirmed. We granted certiorari.

## II.   REVIEW OF SUMMARY PROCEEDINGS

■ ¶6 Summary judgment is appropriate where it appears there is no substantial controversy as to any material fact and one party is entitled to judgment as a matter of law. *Daugherty v. Farmers Coop. Ass'n,* 1984 OK 72, ¶5, 689 P.2d 947, 949; *Crockett v. McKenzie,* 1994 OK 3, ¶3, 867 P.2d 463, 464. Because an order that grants summary relief disposes of legal issues, the review we conduct on appeal is *de novo. Brown v. Nicholson,* 1997 OK 32, ¶5 n. 1, 935 P.2d 319, 321 n. 1; *Manley v. Brown,* 1999 OK 79, ¶22, n. 30, 989 P.2d 448, 455 n. 30. We must examine the pleadings, depositions, affidavits and other evidentiary materials submitted by the parties and affirm if there is no genuine issue as to any material fact. *See Perry v.*

*Green,* 1970 OK 70, 468 P.2d 483, 484(Syllabus by the Court). From the underlying facts contained in such materials, all inferences and conclusions to be drawn must be viewed in a light most favorable to the party opposing the motion. *Ross v. City of Shawnee,* 1984 OK 43, ¶7, 683 P.2d 535, 536.

## III.   NEGLIGENCE

■ ¶7 The appellants allege that Davis allowed Summer to roll off the crib onto the floor, which contributed to her injuries. The appellee asserts it is an uncontested fact that Summer's injuries could not have been caused by the fall described by the appellants. The appellee entered portions of a physician's deposition where he testified about the injuries likely from a fall. In response to the question: "Can you say to a hundred percent certainty, Doctor, that these fractures weren't caused by a fall?" the doctor responded, "I think without being there, nobody could say that with a hundred percent certainty." The doctor stated he believed that blows to the head were the plausible explanation for Summer's fractures rather than a fall from a crib.

¶8 The injuries to Summer did not include just the fractures but also traumatic brain injury. In exhibit A of "Defendant's Motion for Summary Judgment," offered by the appellee, the doctor's answers address the cause of the fractures, not the cause of the brain injury. The appellants' allegation is that "Summer suffered traumatic brain injury as a result of either, or both, the fall and having her head struck against the shelf." Since all inferences and conclusions to be drawn must be viewed in a light most favorable to the party opposing the motion, in this case the appellants, the issue remains in controversy; therefore, summary judgment on this issue is improper. *Ross,* 1984 OK 43, ¶7, 683 P.2d at 536.

---

1.  For our purposes here, the material quoted in the text is the pertinent language contained under numbered paragraph 24 of the Findings of Fact and Acceptance of Plea document. Paragraph 24 asks a criminal defendant whether he/she committed the acts charged against them and further, to state a factual basis for their plea. The quoted material is hand-printed and followed by the initials "A. D." It is unclear from the hand-printing whether what we have designated a semi-colon is in actuality that punctuation or, instead, whether some type of sign or symbol for the word "and" was intended. The semi-colon or "and" mystery is not relevant to an appropriate disposition of the instant matter.

## IV. RESPONDEAT SUPERIOR LIABILITY FOR BATTERY

¶ 9 Davis intentionally struck Summer's head against a shelf at the daycare facility. The issue is whether her employer, the appellee, may be held liable in damages for this intentional wrongful act.

¶ 10 To hold an employer responsible for the tort of an employee, the tortious act must be committed in the course of the employment and within the scope of the employee's authority. *Hill v. McQueen*, 1951 OK 47, ¶¶ 3, 4, 230 P.2d 483, 484–485. As a general rule, an assault on a third person is not within the scope of an employee's authority. *Rodebush v. Oklahoma Nursing Homes, Ltd.*, 1993 OK 160, ¶ 12, 867 P.2d 1241, 1245. The exception to the general rule is well established. An employer may be held responsible for the tort committed by the employee where the act is incidental to and done in furtherance of the business of the employer even though the servant or agent acted in excess of the authority or willfully or maliciously committed the wrongs. *Ada–Konawa Bridge Co. v. Cargo*, 1932 OK 790, ¶ 31, 21 P.2d 1, 7, quoting *Mansfield v. Wm. J. Burns International Detective Agency*, 102 Kan. 687, 171 P. 625 (1918). This is not to say that the commission of the tort was within the scope of the employee's authority, for no authority for such commission could be conferred, but where the employee was acting within the scope of authority to do the particular thing rightfully that was subsequently done in a wrongful manner. *Ada–Konawa*, 1932 OK 790, ¶ 32, 21 P.2d at 7, citing *Bjorkman v. Atchison, T. & S. F. Ry. Co.*, 117 Kan. 420, 231 P. 1029, 1030 (1925), which quoted from *Dixon v. Northern Pac. Ry. Co.*, 37 Wash. 310, 79 P. 943, 944 (1905). *Rodebush* summarized the exception to the general rule as applying where the act is "fairly and naturally incident to the business," and is done "while the servant was engaged upon the master's business and be done, although mistakenly or ill advisedly, with a view to further the master's interest, or from some impulse of emotion which naturally grew out of or was incident to the attempt to perform the master's business." *Rodebush*, 1993 OK 160, ¶ 12, 867 P.2d at 1245, citing *Russell–Locke Super–Service v. Vaughn*, 1935 OK 90, ¶ 18, 40 P.2d 1090,1094, and *Ada–Konawa*, 1932 OK 790, ¶ 33, 21 P.2d at 7. *Rodebush* added that: "An employee's act is within the scope of employment if it is incident to some service being performed for the employer or arises out of an emotional response to actions being taken for the employer." *Rodebush*, 1993 OK 160, ¶ 12, 867 P.2d at 1245.

¶ 11 The appellee asserts, "It is self-evident that the act of smashing a child's head against a shelf does not accomplish the assigned work of caring for, protecting, and nurturing." Appellee's Answer to Appellant's Petition for Certiorari, p. 4. That mischaracterizes the law concerning liability of an employer for the tort of an employee. Where an employee of a daycare center is responsible for the care of infants, some type of stress-induced temporary loss of control over one's behavior (or other psychological malfunction) over a crying baby and/or babies and the act(s) of Davis in hitting Summer's head against a shelf (the cubby) arguably involve "an emotional response to actions being taken for the employer,"[2] if her motivation and purpose in doing so was, in whole or in part, an attempt to quiet the crying infant. Thus, the act(s) may have been an attempt to do a rightful thing (i.e. quiet a crying child) "in a wrongful manner."[3]

¶ 12 Oklahoma case law provides examples of cases involving torts for which the employer was held liable and those in which the employer was not held liable. Early in statehood the Court held that a railroad company was liable for the actions of the train auditor, who falsely imprisoned a passenger arising out of a controversy over the payment of a

2. *Rodebush v. Oklahoma Nursing Homes*, 1993 OK 160, ¶ 12, 867 P.2d 1241, 1245.

3. *Ada–Konawa Bridge Co. v. Cargo*, 1932 OK 790, ¶ 32, 21 P.2d 1, 7, citing *Bjorkman v. Atchison, T.* & *S. F. Ry. Co.*, 117 Kan. 420, 231 P. 1029, 1030 (1925), which quoted from *Dixon v. Northern Pac. Ry. Co.*, 37 Wash. 310, 79 P. 943, 944.

fare. The Court stated the general rule that a corporation, like an individual, is liable for any tort committed by its agent in the course of his employment, "even though the act is done wantonly and recklessly, or was against the express orders of the company." *Chicago R.I. & P. Ry. Co. v. Radford*, 1913 OK 7, ¶ 4, 129 P. 834, 837. Other cases holding the employer liable for the tort of the employee include: *Ada–Konawa Bridge Co. v. Cargo*, 1932 OK 790, 21 P.2d 1 (the servant of the toll bridge company shot an automobile driver when he drove past the toll gate and failed to pay the toll); *Russell–Locke Super–Service v. Vaughn*, 1935 OK 90, 40 P.2d 1090 (the servant of a corporation selling and servicing automobile batteries injured the plaintiff in a fight after the servant tried to repossess a battery from the plaintiff's vehicle); *Mistletoe Express Service v. Culp*, 1959 OK 250, 353 P.2d 9 (the servant for a common carrier of freight assaulted the plaintiff when he refused to accept a television tube after the common carrier denied the plaintiff's claim for damage in transit); and *Rodebush v. Oklahoma Nursing Homes, Ltd.*, 1993 OK 160, 867 P.2d 1241 (the employee of a nursing home forcefully slapped a combative male Alzheimer's patient while bathing the patient).

¶ 13 Cases holding the employer was not liable for the tort of the employee include: *Hill v. McQueen*, 1951 OK 47, 230 P.2d 483 (the manager of a seed company assaulted a former independent sales contractor after the two got into an argument over a disputed debt); *Oklahoma Ry. Co. v. Sandford*, 1953 OK 394, 258 P.2d 604 (bus driver for bus company left his bus parked and assaulted the driver of an automobile and held him for arrest after the bus driver concluded he was drunk); *Tulsa General Drivers, Warehousemen, and Helpers Union, Local No. 523 v. Conley*, 1955 OK 277, 288 P.2d 750 (the agent of the union was picketing a business but left to follow the plaintiff four and one-half blocks to beat him with a board studded with nails, because he had crossed the picket line); *Allison v. Gilmore, Gardner & Kirk, Inc.*, 1960 OK 48, 350 P.2d 287 (a gasoline truck driver was employed by the defendant to drive a truck and deliver gasoline, and while fulfilling those duties, assaulted the plaintiff who was climbing on the gasoline truck); and *N.H. v. Presbyterian Church (U.S.A.)*, 1999 OK 88, 998 P.2d 592 (a Presbyterian minister molested minors, including the plaintiff, during recreational activities aimed at recruiting new members and their families).

¶ 14 The Court in *N.H. v. Presbyterian Church (U.S.A.)* distinguished the facts in that case from those in *Rodebush*. The Court observed that the attendant who was bathing the Alzheimer patient acted impulsively when he slapped the combative patient, but that the impulse naturally arose from the situation he had been placed in by the employer, which was to complete the patient's bath. *N.H. v. Presbyterian Church (U.S.A.)*, 1999 OK 88, ¶¶ 15, 16, 998 P.2d at 599. But the minister acted for his own personal gratification rather than for any religious purpose. *N.H. v. Presbyterian Church (U.S.A.)*, 1999 OK 88, ¶ 18, 998 P.2d at 599.

¶ 15 In the *Hill* case, the Court distinguished it from the *Ada–Konawa Bridge* and *Radford* cases. It was the employee's duty to obtain payment of the toll, in *Ada–Konawa Bridge*, and the train fare in *Radford*. The employee was to withhold the enjoyment of the right or privilege, if payment was not obtained. Since successful performance involved some type of immediate action in opposition to the will of the other, the employer could have anticipated the wrongful acts taken. *Hill*, 1951 OK 47, ¶ 7, 230 P.2d at 485. In contrast, the Court held that McQueen's assault on Hill could not be properly contemplated as an incident to the exercise of ordinary authority to collect indebtedness. *Hill*, 1951 OK 47, ¶ 8, 230 P.2d at 485.

¶ 16 The question of whether or not a servant should be considered to have been acting within the line of duty sufficient to support *respondeat superior* liability is normally a question of fact to be determined by the jury from all the surrounding circumstances. *See Chicago, R. I. & P. Ry. Co.*, 1913 OK 7, ¶ 11, 129 P. at 838; *see also Nail v. City of Henryetta*, 1996 OK 12, ¶ 13, 911 P.2d 914, 918. *Nail* also quotes from Rest.2d Agency § 228 (1958), comment d at 505, as follows, "[t]he question whether or not the

act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated; otherwise, it is decided by the jury." *Nail*, 1996 OK 12, ¶ 13 n. 12, 911 P.2d at 918 n. 12. Only when one reasonable conclusion can be drawn from the facts is it appropriate for a court to rule on a *respondeat superior* issue as a matter of law. *Id.*, 1996 OK 12, ¶ 13, 911 P.2d at 918. Of course, it is a plaintiff's burden to show that the employee was acting within the scope of employment. *Rodebush*, 1993 OK 160, ¶ 12, 867 P. 2d at 1245.

¶ 17 In the instant case, the answer to the *respondeat superior* issue primarily lies in determining whether Davis had stepped aside from her employment at the time of the offending tortious act(s) on some mission or conduct to serve her own personal needs, motivations or purposes. *See Tulsa General Drivers, Warehousemen, and Helpers Union, Local No. 523 v. Conley and Oklahoma Ry. Co. v. Sandford.* Our view of the instant matter is consistent with Rest.2d Agency § 245 (1958), comment f at 541, which provides

> *f. Servant actuated by personal motives.* The liability of a master for the use of force by a servant is not prevented by the fact that the servant acts in part because of a personal motive, such as revenge. The master, however, is relieved from liability under the rule stated in this Section if the servant has no intent to act on his master's behalf, although the events from which the tortious act follows arise while the servant is acting in the employment and the servant becomes angry because of them. The

fact that the servant acts in an outrageous manner or inflicts a punishment out of all proportion to the necessities of his master's business is evidence indicating that the servant has departed from the scope of employment in performing the act.

¶ 18 In our view, a jury, as fact-finder (assuming the parties do not waive a jury trial) must decide if Davis's acts were so far removed from any work-related endeavor and geared, instead, toward a personal course of conduct unrelated to her work so that it would no longer be appropriate to hold her employer responsible for her act(s). Therefore, the purpose or motivation behind Davis's act(s) is an important, and potentially an overriding, consideration permeating resolution of arriving at a correct answer to the *respondeat superior* question. The statement on the plea document does not unequivocally answer the motivation question. In other words, one cannot tell from the words used in the plea document ("I hit Summers (sic) head against the cubby; she was crying she wouldn't stop crying") the purpose or motivation underpinning the act(s) of hitting the infant's head against the shelf (i.e., the cubby). Was it in whole or in part a misguided attempt to quiet the infant or, was it a conscious attempt to harm or injure the child because of Davis's own personal irritation or annoyance at the child?[4] If the latter, the employer would not be liable under the doctrine of *respondeat superior*; if the former a jury (under appropriate instructions), as fact-finder, might be warranted in finding employer liable under the *respondeat superior* doctrine.[5]

---

**4.** For conviction under the criminal statute (10 O.S. § 7115) to which Amy Davis pled guilty it is not required that a specific intent to injure or harm be shown, only an intent or purpose to do the act. In other words, § 7115 encompasses a general intent crime not a specific intent crime. See *Fairchild v. State*, 1999 OK CR 49, ¶¶ 23–57, 998 P.2d 611, 618–624, *cert. denied*, 532 U.S. 1039, 121 S.Ct. 2002 (2001)(interpreting 21 O.S. 1991, § 701.7(C)—First Degree Murder of a Child statute—which included the acts contained in 21 O.S. 1991, § 843, § 843 being later amended and incorporated in § 7115). The current version of § 7115 may be found at 10 O.S.Supp. 2002, § 7115.

**5.** We have no doubt, of course, that attempting to quiet a crying child in appropriate ways (e.g., use

of the caregiver's hand to softly or gently tap the infant's back while cradling/holding the child on one's shoulder) would be considered conduct within the scope of Davis's employment. We also believe that whether Davis's act(s) could have been foreseen, anticipated or were not unexpectable by appellee is a matter for jury determination. We further note that nothing in this opinion should be taken, in any way, to condone the abhorrent act of Amy Davis hitting the infant Summer's head against a shelf (i.e., the cubby). All, including the members of this Court, surely condemn such conduct. Condemnation of the conduct, however, does not necessarily lead to a rightful conclusion of the *respondeat superior* question. That issue, from the record before us in this case, is answered primarily by determining

## CONCLUSION

¶ 19 We hold the issue concerning appellee's *respondeat superior* liability for the act(s) of Davis in hitting Summer's head against the shelf (the cubby) is not one subject to determination as a matter of law on the instant summary judgment record. We also hold that the issue regarding any injury resulting from a fall remains in controversy and summary judgment on it was improper. Accordingly, the judgment of the trial court is reversed and the cause is remanded for proceedings not inconsistent with this opinion.

## CERTIORARI PREVIOUSLY GRANTED; OPINION OF THE COURT OF CIVIL APPEALS VACATED; JUDGMENT OF THE DISTRICT COURT REVERSED AND REMANDED.

¶ 20 LAVENDER, HARGRAVE, OPALA, KAUGER and EDMONDSON, JJ., concur.

¶ 21 WATT, C.J., WINCHESTER, V.C.J., TAYLOR and COLBERT, JJ., dissent.

OPALA, J., concurring.

¶ 1 I concur in today's opinion and write separately to provide additional analysis that

> whether Davis engaged in a course of conduct motivated by her own personal reasons or, instead, whether she was wholly or partly still engaged in some type of misguided attempt to carry out the business of her employer. If personal motivation was the sole moving force behind the act(s), the employer should not be required to respond in damages for her actions; but, if the act(s) were an attempt to carry out the employer's business (even though the acts are abhorrent and should plainly be condemned by any right thinking person) the employer may be made to respond in damages for the actions of its employee, if a jury so decides under appropriate instructions on the issue.

1. *Reed v. Anderson,* 1927 OK 334, 259 P. 855, 856.

2. This approach to *respondeat superior* liability for an employee's on-duty assault, much like that in this case, is proposed by **Comment f, § 245, Restatement (Second) of Agency (1958)**, where it is stated:

> "f. Servant actuated by personal motives.
> The liability of a master for the use of force by a servant is not prevented by the fact that the servant acts in part because of a personal motive, such as revenge. The master, however, is relieved from liability under the rule stated in this Section if the servant **has no**

supports the court's reversal of summary judgment.

### I

## WHETHER A SERVANT WAS ACTING AS AN AGENT FOR HER MASTER IS A QUESTION OF FACT AND NOT A QUESTION OF LAW

¶ 2 The core issue of whether the caregiver-assailant, while in the act of hitting an infant, believed she was furthering the master's interests or acted on an emotional impulse of her own, presents an agency-status question of fact.[1] There is ample indication in the evidentiary material used in the summary nisi prius process which makes the employer's *respondeat superior* liability an issue (a) either of a disputed fact or (b) one of undisputed fact from which opposite inferences may be drawn.

¶ 3 Abandonment of a mission for the master to follow a personal pursuit occurs, in a case like this, with a change in the servant's mental state. It may happen in a veritable instant by a sudden transformation of the mind.[2] The change's occurrence need not be

> intent to act on his master's behalf, although the events from which the tortious act follows arise while the servant is acting in the employment and the servant becomes angry because of them. **The fact that the servant acts in an outrageous manner or inflicts a punishment out of all proportion to the necessities of his master's business is evidence indicating that the servant has departed from the scope of employment in performing the act.**"
> (emphasis added).
> The current ALI project on a new agency's restatement is still work in progress. Its most recent draft of **Chapter 7 (Torts—Liability of Agent and Principal), proposed Restatement (Third) of Agency** (Tentative Draft No. 5, 2004), appears to make extensive changes in *respondeat superior* liability for an on-duty assault upon a third party. The changes, all of which appear consistent with this concurrence, are manifested by these telling snippets from the text:
> "§ 7.07 Employee Acting Within Scope of Employment * * * (2) An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment **when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.**"
> (emphasis added).

apparent to an eye nor be confirmable by visual or auditory senses.[3] It must be divined from the totality of circumstances that include the caregiver-assailant's behavior at and immediately before the critical moment.[4]

## II

## THE RECORD OF JUDICIAL PROCESS THAT CULMINATED IN THE NISI PRIUS SUMMARY JUDGMENT FOR THE DEFENDANT, WHICH THE COURT REVERSES TODAY, SUPPORTS NEITHER A JUDGMENT FOR THE PLAINTIFF NOR ONE FOR THE DEFENDANT

### A.

### *The Standard of Review On Summary Process*

¶ 4 Summary judgment is permissible *only if* no substantial controversy exists as to any material fact.[5] Disputed issues of fact must be resolved by trial, the law's very antithesis of summary decisional process. **When uncontroverted proof lends support to conflicting inferences,**[6] **the choice to be made**

**Comment:**

"b. * * * Under subsection (2) an employee's tortious conduct is outside the scope of employment when the employee is engaged in an independent course of conduct not intended to further any purpose of the employer. ... The **employee's intention severs the basis for treating the employee's act as that of the employer** in the employee's interaction with the third party."

"c. * * * In determining whether an employee's tortious conduct is within the scope of employment, the nature of the tort is relevant, as is whether the conduct also constitutes a criminal act. **An employee's intentionally criminal conduct may indicate a departure from conduct within the scope of employment,** not a single escalation. ... Matters of degree are also relevant to this determination. For example, in Illustration 5, A's act is within the course of employment when A slams into the stack of trays at the culmination of A's attempt to resolve T's complaint about service in the restaurant. If, instead, A draws a gun and shoots T, **the nature of A's action—which constitutes a serious crime—and its extreme nature** may indicate that A has launched upon an independent course of action. * * *"
(emphasis added).

**REPORTER'S NOTES:**

*Smith v. Goodyear Tire & Rubber Co.*, Inc., 856 F.Supp. 1347 (W.D.Mo. 1994), is cited as a representative recent case "involving intentional torts within the scope of employment." In *Smith*, the court gave the plaintiff/franchisee (nonmovant) the benefit of all reasonable inferences from the evidence, holding that summary judgment is inappropriate when there is a **dispute over a material fact as to the motivation of the** defendant/franchisor's **employee,** who allegedly acted intentionally to harm the franchisee.

3. By the evolving norms of soon-to-be restated common law of today, the line separating a master's *respondeat superior* liability from a servant's individual responsibility for the latter's on-duty assault is drawn somewhere between a servant's venting purely personal spleen on a third party and the point at which the servant continues to press the master's interest with mistaken vigor and in an inappropriately aggressive manner.

4. *Rodebush v. Oklahoma Nursing Homes, Ltd.,* ¶¶ 12–15, 1993 OK 160, 867 P.2d 1241, 1245–46; *Mistletoe Express Service v. Culp*, 1959 OK 250, ¶ 28, 353 P.2d 9, 12; *Hill v. McQueen*, 1951 OK 47, ¶ 7, 204 Okl. 394, 230 P.2d 483, 485–86. *Hill* reflects the earlier common-law view by which employer's *respondeat superior* liability for the employee's on-duty assault was treated as a question of law when the assault could be deemed clearly unrelated to the duties of employment. **Measuring this case by the standards of yore, one cannot say that the employee's assault was clearly unrelated to the duties of her employment.** Nor can one conclude, **without first committing to a preference among the competing inferences,** that the caregiver's act was related to the duties of her employment. **It is hence clear here that making that critical choice is not a judge's but a jury's province.**

5. *Wathor v. Mutual Assur. Adm'rs, Inc.*, 2004 OK 2, 87 P.3d 559, 566.

6. An inference is a "process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or state of facts, already proved or admitted. Inferences are deductions or conclusions which with reason and common sense lead the jury to draw from facts which have been established by the evidence in the case. An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group

between the opposite alternatives does not present an issue of law for the court but rather one for the trier of fact.[7] All inferences to be drawn from the evidentiary materials must be viewed in the light most favorable to the nonmoving party.[8] Only if the court should conclude there is no material fact (or opposite inferences) in dispute and the law favors the movant's claim or liability-defeating defense is the moving party entitled to summary relief in its favor.

### B.

### The Employer's Vicarious Tort Liability

¶ 5 The common-law doctrine of *respondeat superior* makes an employer vicariously liable for the acts or omissions of an employee acting within the scope of his employment. If the employee's offending conduct may be viewed as willful, an employer cannot be held vicariously liable unless its employee's act is found to have been "incidental to and in furtherance of" its business.[9] Except in cases where only one reasonable deduction can be drawn from the facts, the question whether an employee has acted within the scope of employment at any given time is generally one for the trier of fact.[10]

### C.

### The Record Does Not Support but a Single Inference That Establishes The Hospital Vicariously Liable as a Matter of Law

¶ 6 An examination of the evidentiary materials submitted in favor of plaintiffs' quest for summary relief demonstrates that both parties rely on uncontroverted facts from which opposing inferences may be drawn.[11] The caregiver-assailant's **guilty plea** in the felony child abuse case as well as her statements to the detective about the circumstances of the child's injuries support inferences for both exoneration and liability. **One inference** would tend to indicate that by striking the baby's head in an attempt to quiet it the caregiver-assailant believed she was in fact furthering the master's interests or she was acting on an emotional impulse that grew out of (or was incident to) an attempt to perform the master's business. **But a contrary inference also can clearly be drawn** from the caregiver-assailant's ad-

of facts found or otherwise established in the action." William E. Gallagher, Ronald C. Goodstein, Ph.D., *Inference Versus Speculation in Trademark Infringement Litigation: Abandoning the Fiction of the Vulcan Mind Meld*, The Trademark Reporter 1237 (November-December 2004), citing Black's Law Dictionary, 700 (5th edition 1979).

"An inference is a permissible deduction from the evidence, and in dealing with inference the jury is at liberty to find the ultimate fact one way or the other as it may be impressed by the testimony, and the reasonable and permissible deductions therefrom. Inferences have no significance as to the duty of either party to produce evidence, and the jury may give to inferences whatever force or weight it thinks they are entitled to." *Stumpf v. Montgomery*, 1924 OK 360, ¶ 0, syl. 5, 101 Okl. 257, 226 P. 65.

7. *Walters v. J.C. Penney Co., Inc.*, 2003 OK 100, 82 P.3d 578; *Wetsel v. Independent School District I-1*, 1983 OK 85, ¶ 8, 670 P.2d 986, 990–91; *Mistletoe Express Service v. Culp*, supra note 4, 353 P.2d at 12.

8. *Carmichael v. Beller*, 1996 OK 48, ¶ 2, 914 P.2d 1051, 1053.

9. The employer's *respondeat superior* liability is controlled by the teachings restated in *Rodebush v. Oklahoma Nursing Homes, Ltd.*, supra note 4, 867 P.2d at 1245–46; see also *Nelson v. Pollay, M.D.*, 1996 OK 142, 916 P.2d 1369, 1374, n. 23;

*Texaco, Inc. v. Layton*, 1964 OK 51, ¶ 7, 395 P.2d 393, 396.

10. *Carswell v. Oklahoma State Univ.*, 1999 OK 102, ¶ 20, 995 P.2d 1118, 1123; *Nail v. City of Henryetta*, 1996 OK 12, ¶ 13, 911 P.2d 914, 918. As stated in *Mistletoe Express Service v. Culp*, supra note 4, at ¶ 28, 353 P.2d at 12, "the employer is not liable to third person not an invitee upon its premises for the tortious act of its employee or agent unless it is shown that such employee or agent was acting within the scope of his employment, and that **the act complained of was done as a means of carrying out the job assigned to him by the employer.** In other words, the fact that at the time of the assault upon the third person the employee or agent was about his employer's business is not sufficient to affix the liability for the resulting damages upon the employer, but **it must be shown that the act complained of was done for the purpose of doing the work assigned to him.**" *Id. citing Hill v. McQueen*, supra note 4.

11. *See, e.g., Canida v. Technotherm Corp.*, 2000 OK 83, ¶ 2, 16 P.3d 1127, 1130 (Opala, J., concurring). The dispositive issue formed by the evidence was whether the claimant could be considered "aggressor, initiator or voluntary participant" in horseplay. From the critical record proof opposite inferences could be drawn as to the claimant's involvement in the happenings immediately preceding the harm-dealing event. The choice to be made between these opposite inferences was for the trier of fact. *Id.*

mission of an intentional felony assault upon the infant. Her guilty plea facially shows a state of mind incompatible with performing a mission for the employer.[12] That contrary inference is more consistent with the notion that she had departed from the employer's mission to commit an intentional criminal act prompted by purely personal motives of annoyance (or irritation) unrelated to accomplishing any objectives incident to the employer's interest. In short, the caregiver-assailant's admission against interest in the criminal case tends to reveal her motives to have been *dehors* the scope of employment. Inferences to be drawn from this evidentiary material should be viewed in the light most favorable to the nonmoving party—the Hospital.

¶ 7 This case demonstrates a classical scenario for jury assessment. The Hospital de-fending against *respondeat superior* liability must convince the jury that for an instant—no matter how short—its employee formulated an intent to harm the baby which was sufficient in law to sever her act from her mission for the employer.[13] The **plea of guilty to an intentional felony assault does by itself** support the Hospital's claim to not being civilly accountable. On the other hand, the plaintiffs may draw numerous inferences to persuade the triers that the caregiver-assailant's acts are entirely consistent with her continued and uninterrupted course of performance of a mission for the employer.

¶ 8 The submission of *respondeat superior* liability to the trier is commanded by Art. 2, § 19, Okl. Const.[14] Moreover, it is highly improper for an appellate court to make first-instance determinations of disputed issues of either law or fact.[15] That function

---

**12.** Hospital tendered the appearance docket in the criminal case brought against the employee-caregiver for felony child abuse under the provisions of 10 O.S.2001 § 7115. The docket indicates that an information was prosecuted against the caregiver-assailant and that she entered a plea of guilty. A felony judgment entered upon a plea of guilty, which is no longer subject to appellate review, is admissible in a civil case (12 O.S.2001 § 2803) solely as an **admission against interest.** *Laughlin v. Lamar*, 1951 OK 330, ¶ 5, 237 P.2d 1015, 1016; *Dover v. Smith*, 1963 OK 166, 385 P.2d 287; *Zumwalt v. Moran*, 1953 OK 223, ¶ 0 syl. 2, 260 P.2d 725. The only relevant evidence in the caregiver-assailant's criminal case is her guilty plea and a stipulation of the offense to which the defendant pled guilty. A complete judgment roll in the criminal case is not needed because there is nothing in that judgment roll which would be admissible in the civil case. This case is distinguishable from *Salazar v. City of Oklahoma City*, 1999 OK 20, 976 P.2d 1056, where a complete judgment roll in a **federal-court civil rights case** was needed in support of the City's issue-preclusion defense interposed in a state-law tort action against the City.

**13.** In the nineteenth-century English *respondeat superior* jurisprudence legal excision of a servant's on-the-job tort from his employment-related duties is described as placing him *pro tonto* "on a frolic of his own." *Joel v. Morison*, 172 Eng.Rep. 1338, 1338–39 (1834); *Faragher v. City of Boca Raton*, 524 U.S. 775, 794, 118 S.Ct. 2275, 2287, 141 L.Ed.2d 662 (1998). Applying this colorful phrase to the problem at hand, the question to be posed for our answer here is **whether the servant's assault occurred when she was on a frolic of her own or can be said to have arisen out of her employment.** As so re-posed, the question simply cannot be answered as a matter of law.

This is so because it calls for a forensic exploration into the servant's mental state at the critical time in question—the moment of her assault and immediately anterior to its occurrence—before legal accountability for the act may be shifted from the master to the actor and *respondeat superior* liability eliminated from application to the case.

**14.** If the court were to follow here a pure summary-judgment analysis, its reasoning would result in an impermissible judicial intervention in the fact-finding process. It would also violate the plaintiffs' fundamental-law right to trial by jury under the standards of Art. 2 § 19, Okl. Const. That section keeps "inviolate" the common-law norms for drawing the line at which submission to the trier is a party's due. Because these standards are enshrined in the state constitution—which adopted the English common-law system that prohibits judges from weighing evidence—they cannot be abrogated (impaired or abridged) by legislative or judicial action. *Seymour v. Swart*, 1985 OK 9, 695 P.2d 509, 511; *see also Weldon v. Dunn*, 1998 OK 80, ¶ 24, 962 P.2d 1273, 1283 (Opala, J., dissenting); *Williams v. Tulsa Motels*, 1998 OK 42, ¶ 27, 958 P.2d 1282, 1291–92 (Opala, J., dissenting); *McLin v. Trimble*, 1990 OK 74, 795 P.2d 1035, 1044 (Opala, V.C.J., dissenting). Here a choice needs to be made between conflicting inferences. The constitutional adoption of the common-law norm for submission of issues to a jury unequivocally commands that choicemaking between opposite inferences from undisputed proof be treated as a function of the trier of fact.

**15.** *Dyke v. St. Francis Hosp., Inc.*, 1993 OK 114, ¶ 11, 861 P.2d 295, 299–300; *Hadnot v. Shaw*, 1992 OK 21, ¶ 15, 826 P.2d 978, 983.

belongs to the trial-level tribunals in every case—whether in law, equity or on appeal from an administrative body.

## III

### SUMMARY

¶ 9 The determination of *respondeat superior* liability presents a question of fact, not of law. Its resolution by the court would usurp both parties' right to a jury's decision which is guaranteed by the provisions of Art. 2 § 19, Okl. Const.

¶ 10 I hence join the court's reversal of the trial court's summary judgment and its vacation of the pronouncement by the Court of Civil Appeals.